Filed 6/3/16  P. v. Gomez CA4/1

**NOT TO BE PUBLISHED IN OFFICIAL REPORTS**

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

COURT OF APPEAL, FOURTH APPELLATE DISTRICT

DIVISION ONE

STATE OF CALIFORNIA

| | |
|---|---|
| THE PEOPLE, | D067057 |
| Plaintiff and Respondent, | |
| v. | (Super. Ct. No. SCD253574) |
| ALEJANDRO GOMEZ, | |
| Defendant and Appellant. | |

APPEAL from a judgment of the Superior Court of San Diego County, Peter C. Deddeh, Judge.  Affirmed in part; reversed in part and remanded.

Gary V. Crooks, under appointment by the Court of Appeal, for Defendant and Appellant.

Kamala D. Harris, Attorney General, Julie L. Garland, Assistant Attorney General, Peter Quon, Jr., and Stacy Tyler, Deputy Attorneys General, for Plaintiff and Respondent.

A jury convicted Alejandro Gomez of attempted burglary, three counts of first degree burglary of inhabited dwellings, two counts of unlawfully taking and driving a

vehicle, unlawful possession of ammunition, and two counts of grand theft of a firearm. He appeals, contending: (1) the trial court erroneously ruled that each of the charged counts was cross-admissible to prove other charges; (2) the trial court failed to sua sponte instruct the jury on accomplice status and testimony; (3) insufficient evidence supported multiple counts; (4) the prosecutor committed prejudicial misconduct; and (5) the trial court failed to warn him of the consequences of admitting his prior convictions. The Attorney General concedes, and we agree, that the trial court failed to warn Gomez that admitting his prior convictions would subject him to a longer prison term. Accordingly, we reverse the sentence enhancements for Gomez's five prison priors and remand for a new adjudication on the allegations, either by trial or admission. In all other respects, we affirm.

FACTUAL AND PROCEDURAL BACKGROUND

*Count 1: Attempted Burglary of Francisco Quiroz's Vehicle*

On an early morning in April 2011, Francisco Quiroz heard a loud noise of "metal to metal, grinding" outside of his bedroom window where he had parked his 2003 Jeep Cherokee vehicle. Quiroz looked out of his window and saw a Hispanic man, about five feet, six inches tall, and dressed in black trying to break into his Jeep. Quiroz yelled at the man and the man ran off.

Quiroz called the police. When an officer arrived, he found that someone had tampered with the driver's side door lock on Quiroz's vehicle and there was a red colored stain on the door handle. The officer believed the red matter was blood and took a

2

biological stain sample. An analysis of the stain sample concluded it had a mixture of DNA from two people.

In 2013, the San Diego Police Department obtained a DNA sample from Gomez. Gomez's DNA matched the predominant DNA profile obtained from the swab of the bloodstain on Quiroz's vehicle. The probability that a person selected at random would match the DNA obtained from Quiroz's vehicle was one in 1.2 sextillion for the Caucasian population, one in 87 sextillion for the African-American population, and one in 10 sextillion for the Hispanic population.

*Count 2: Burglary of Ricardo Rodriguez's Home*

On a night in August 2012, Andre Tate saw Gomez park a Honda Accord in a poorly lit area and then walk to the front door of the home of Tate's neighbor, Ricardo Rodriguez. Tate observed Gomez walking around Rodriguez's house, peering in windows in a suspicious manner, and knocking on the front door. Tate then heard Gomez jump on trash cans. Tate proceeded to his own backyard and saw Gomez in Rodriguez's bedroom "looking for stuff." Tate demanded to know what Gomez was doing in Rodriguez's home. Gomez responded, "he knows I'm here." Tate said, "No he don't. Get the fuck out of my homeboy's house." Tate told his wife to call the police.

Tate grabbed a bat and went to the front of the house, anticipating that Gomez would exit out the front door, but did not see Gomez again. While Tate was waiting for the police, Rodriguez arrived home. Tate told Rodriguez someone had broken into Rodriguez's house and pointed out the car in which the burglar had arrived.

3

Inside the house, Rodriguez discovered that his bedroom closet had been ransacked, his sheets were moved, and his step daughter's shoes were missing. Rodriguez believed the burglar entered through one of two windows because the screens on those windows were ripped before the burglary.

San Diego Police Department Officer Kyle Williams responded to Rodriguez's house. Officer Williams found no signs of forced entry and believed the burglar entered through an unlocked back door. Officer Williams examined the Honda Accord in which Gomez had arrived. The windows were down and the doors were unlocked. Officer Williams attempted to contact the vehicle's registered owner and left it where it was parked.

After Officer Williams left, Rodriguez put gloves on and found registration paperwork in the car's interior. He also saw a screwdriver on the driver's side floorboard. Rodriguez called the vehicle's registered owner, Joyce Haffey, who had not given anyone permission to drive her car and was unaware at that point that it had been stolen.

A few hours later, Gomez returned to the Honda. Tate said to Rodriguez, "That's the guy." Rodriguez tried to stop Gomez, but Gomez almost ran him over. Rodriguez called the police, but Gomez was gone by the time an officer arrived. Officers recovered the Honda approximately one week later.

As part of the police investigation, an officer showed Tate and Rodriguez a photo lineup. Tate immediately identified Gomez as the burglar in the photo lineup. According to Tate, he remembered Gomez's face because they had a brief conversation while Gomez was in Rodriguez's well-lit bedroom.

4

*Count 3: Unlawful Taking and Driving of Joyce Haffey's Honda*

On the same night as the Rodriguez burglary, Haffey had parked her Honda Accord in her designated parking space in an alley behind her home in Normal Heights. Haffey believed she had locked her car and had both key fobs for it, but left the valet key in the glove compartment. That night, Haffey received a call from Rodriguez. Rodriguez told Haffey that her car may have been involved in a crime. Haffey looked for her car and saw that it was gone. She called the police.

Approximately one week later, Officer Brandon Woodland investigated a report of a possible stolen vehicle in the Mid City area of San Diego, which was about a mile and a half from Haffey's home. The vehicle was Haffey's Honda Accord. Inside the vehicle, officers found various items that did not belong to Haffey, including a bag of men's clothing, a backpack, a beer can, and a loaded magazine for a nine millimeter firearm.

Officer Woodland collected items from Haffey's car for DNA testing. A pair of sunglasses from the bag of clothing and the beer can had DNA matching Gomez's profile on them. The probability that an individual selected at random would match the DNA profile collected from the evidence was one in 1.2 sextillion in the Caucasian population, one in 87 sextillion in the African-American population, and one in 10 sextillion in the Hispanic population.

*Count 4: Unlawful Possession of Ammunition*

The loaded nine millimeter firearm magazine recovered from Haffey's vehicle did not belong to her. A criminalist was only able to recover a partial DNA profile from a

swab of the magazine because there was a "low level" of DNA on it. The criminalist concluded Gomez was a possible source of the DNA.

The parties stipulated Gomez had previously been convicted of a felony.

*Count 5: Unlawful Taking and Driving of Ivan Lopez's Acura*

On an evening in June 2013, Ivan Lopez parked his red Acura Vigor near his home in the Logan Heights area of San Diego. He could not recall whether he had locked it. When he went outside the next morning, the car was gone. Lopez called the police and reported his car stolen.

Two days later, San Diego Police Officers Jared Thompson and John Denny, who were on a special detail assignment to locate stolen vehicles, spotted an Acura Vigor closely followed by a cream colored Lincoln Continental. Officer Thompson radioed uniformed members of his team to check the license plates of both vehicles and, as a result, learned the Acura was stolen. The Lincoln was not a stolen vehicle.

The Acura and the Lincoln pulled over and parked at 3100 Clay Avenue. Officers Thompson and Denny observed the Acura until Officers John Rzucidlo and Robert Withers arrived. The Lincoln pulled away from the curb, while the Acura remained. When Officers Rzucidlo and Withers arrived and inspected the Acura, they found it was unoccupied and unlocked.

Officer Withers contacted Lopez, who came to the location to retrieve his car. Lopez's stereo and a box of tools worth approximately $500 were missing from the vehicle. The vehicle's ignition appeared to have been forced with a screwdriver. Inside

6

the vehicle, officers found a screwdriver that did not belong to Lopez. Officer Withers took swabs from the steering wheel and gear shift for DNA testing.

Meanwhile, Officers Thompson and Denny drove around and located the Lincoln. They followed it until it parked in front of 3019 Clay Avenue. Officer Thompson contacted the Lincoln's driver, Javier Monterossa. Monterossa told Officer Thompson that Gomez had called him that morning to ask for a ride. Monterossa drove to 3019 Clay Avenue and saw Gomez standing outside. Monterossa told Officer Thompson that Gomez got into the driver's seat of a red car and drove down the block while Monterossa followed in the Lincoln. Gomez parked at the curb, exited the vehicle, and requested that Monterossa drive him to a nearby liquor store. After going to the liquor store, they returned to a house on Clay Avenue where Gomez got out and told Monterossa to wait while he went inside the house.

Later, Officer Denny went back and contacted Gomez at the house where the Lincoln had parked on Clay Avenue. Officer Denny obtained a DNA sample from Gomez.

At trial, Monterossa stated that he did not want to testify. He acknowledged Gomez called him to ask for a ride and that he picked Gomez up on Clay Avenue. Monterossa testified he did not know anything about the red car, never saw Gomez get into a red car, and did not tell the police that Gomez got into and drove a red car. Monterossa claimed he simply picked Gomez up, took him to a store, and then returned to a house on Clay Avenue. Monterossa denied telling police that Gomez went into the house.

7

A criminalist tested the swabs Officer Withers had taken from the steering wheel and gear shift of Lopez's Acura for DNA. The DNA analysis included at least two contributors. Gomez was a possible "major contributor." The chance a person selected at random would match the DNA was one in 8.8 quadrillion for the Caucasian population, one in 240 quadrillion for the African-American population and one in 22 quadrillion for the Hispanic population.

*Count 6: Burglary of Charito Garcia's Home*

On an evening in September 2013, Charito Garcia returned to her home in the Talmadge area of San Diego and found the kitchen door and window open. She had locked all doors and latched all windows before she left her house that morning. Garcia's belonging were in boxes because she had just moved into the house.

Garcia saw that someone had rummaged through her boxes and her belongings were strewn about. She owned many items of jewelry, which were all missing. The burglar also stole Garcia's new computer, backpack, toothpaste, soap, shampoo and cigarettes.

The burglar left behind an opened bottle of beer on the kitchen counter that he had taken from Garcia's refrigerator. DNA obtained from the mouth area of the bottle matched Gomez's DNA profile. The probability that an individual selected at random would match the DNA on the bottle was one in 1.2 sextillion for the Caucasian population, one in 87 sextillion for the African-American population, and one in 10 sextillion for the Hispanic population.

8

*Counts 7, 8, and 9: Burglary of Christian Carranza's Home and Two Counts of Grand Theft of a Firearm*

Christian Carranza was a United States Border Patrol Agent. On an evening in September 2013, Carranza left his home in the City Heights area of San Diego to go to dinner. Before he left, he secured his two loaded firearms, badge, and credentials in a Border Patrol issued "briefcase-type" safe and left it in his bedroom. He also locked his doors, but left a few windows open two to three inches to provide fresh air for his puppy. Carranza had security apparatuses in the windows to keep them from opening further.

When Carranza arrived home shortly before 11:00 p.m., he saw his metal security door open and two window screens leaning against his house. When he entered his house, Carranza found his bedroom had been "ransacked." His gun safe was open and the items in it, including his two guns, badge and credentials, were missing. The gun safe looked like it had been pried open with a screwdriver.

Carranza also discovered his rare 1996 Nike Air Max Moore Tempos, worn by NBA player Scottie Pippen in the 1996 NBA finals, an iPad, two iPods, two pairs of sunglasses, multiple headphones, and clothing were missing. Two beers were missing from the refrigerator. The burglar left behind a pair of red and white Nike shoes and a screwdriver.

Carranza believed the burglar came in through the bedroom window because the blinds were disturbed and the security apparatus that had been on it was on the floor. Carranza called the police.

9

Both of the red and white Nike shoes left behind in Carranza's home had a mixture of DNA from at least four people. Gomez was a possible major contributor to the DNA on both the left and right shoe. The probability that a person selected at random would be included as a possible major DNA contributor to the swab of the right shoe was one in two million for the Caucasian population, one in 33 million for the African-American population, and one in nine million for the Hispanic population. Similarly, the results for the left shoe were one in 38 billion for the Caucasian population, one in 770 billion for the African-American population, and one in 98 billion for the Hispanic population. The screwdriver recovered from Carranza's home had a mixture of DNA from at least three people. The predominant DNA profile obtained from the screwdriver matched Gomez's DNA profile. The probability that an individual selected at random would have the same DNA as the predominant DNA profile on the screwdriver was one in 1.12 sextillion for the Caucasian population, one in 87 sextillion for the African-American population, and one in 10 sextillion for the Hispanic population.

DISCUSSION

I. <em>Cross-Admissibility of Evidence</em>

A. Additional Background

The People moved in limine for a ruling that the evidence of the charged crimes in counts 1 through 7 was cross-admissible under Evidence Code section 1101, subdivision (b), to prove common scheme or plan, intent, and identity for all counts. (Undesignated statutory references are to the Evidence Code.) The People clarified they were not seeking to lower their burden of proof on the other crimes because they were charged

10

crimes that the People were required to prove beyond a reasonable doubt. Rather, the People sought to alert the court and the defense that they sought to make the evidence cross-admissible to show identity, motive and knowledge. Defense counsel indicated he understood the prosecutor's concerns, but his concern was that "each count [had] to stand on its own." The court noted that defense counsel's concerns could be addressed by a jury instruction that each count must be considered separately.

On the court's request, the People recited a summary of the facts underlying the charges, pointing out that multiple crimes included evidence of beer left behind, a screwdriver, and unlawful entry through a window. The court found there were "several points that these counts show identity and show MO with regard to the driving the car, with regard to auto theft, with regard to the beer."

B. Applicable Legal Principles

Section 1101, subdivision (b), authorizes admission of "evidence that a person committed a crime, civil wrong, or other act" to prove some fact, other than propensity, "such as motive, opportunity, intent, preparation, plan, knowledge, identity, absence of mistake or accident . . . ." (*Ibid*.; § 1101, subd. (a) [prior criminal act normally not admissible to prove conduct].) The admissibility of uncharged crimes depends on: " '(1) the materiality of the facts sought to be proved, (2) the tendency of the uncharged crimes to prove those facts, and (3) the existence of any rule or policy requiring exclusion of the evidence.' " (*People v. Kelly* (2007) 42 Cal.4th 763, 783; *People v. Ewoldt* (1994) 7 Cal.4th 380, 402 (*Ewoldt*).) "Admission of the evidence involves, inter alia, the danger of confusing the issues, introducing collateral matters, or tempting the jury to condemn

11

[the] defendant because he has escaped adequate punishment in the past." (*People v. Soper* (2009) 45 Cal.4th 759, 772-773 (*Soper*).)

"[T]he applicable analysis is significantly different in the context of properly joined charged offenses. [Citations.] . . . When the offenses are [properly] joined for trial the defendant's guilt of all the offenses is at issue and the problem of confusing the jury with collateral matters does not arise. The other-crimes evidence does not relate to [an] offense for which the defendant may have escaped punishment." (*Soper*, *supra*, 45 Cal.4th at p. 773.)

"[T]here exists a continuum concerning the degree of similarity required for cross-admissibility, depending upon the purpose for which introduction of the evidence is sought: *'The least degree of similarity . . . is required in order to prove intent . . . .* In order to be admissible [for that purpose], the uncharged misconduct must be sufficiently similar to support the inference that the defendant " 'probably harbor[ed] the same intent in each instance.' [Citations.]" [Citation.]' [Citation.] By contrast, a higher degree of similarity is required to prove common design or plan, and the highest degree of similarity is required to prove identity." (*Soper*, *supra*, 45 Cal.4th at p. 776.) In evaluating the use of "other crimes" evidence on the issues of identity, motive and intent, a trial court must "carefully review each count in light of the alleged 'other crimes' evidence to determine its probativeness to prove a material fact other than criminal disposition and then . . . weigh its probative value against its prejudicial effect before it is admitted." (*People v. Armstead* (2002) 102 Cal.App.4th 784, 793-794; §§ 1101, subd. (b), 352; *Ewoldt*, *supra*, 7 Cal.4th at p. 404.)

12

C. Analysis

Gomez argues the trial court erroneously ruled that each of the charged counts was cross-admissible to prove other charges. He does not dispute that the charges were properly joined and that the jury would have heard all evidence relating to the charges even without the court's ruling. However, Gomez contends the court failed to conduct a proper analysis regarding cross-admissibility and its ruling improperly allowed the prosecutor to argue the evidence of certain counts showed he had a criminal propensity to commit other counts.

Here, evidence on some counts was cross-admissible to show intent and a common plan or scheme. For example, in the Haffey and Lopez car thefts, the thief took the vehicles in the evening or night after the owners had parked outside their homes around 6:00 p.m. In both instances, the thief left behind a screwdriver and officers recovered DNA matching Gomez's profile. Likewise, the Rodriguez, Garcia and Carranza burglaries had similar characteristics. In all three burglaries, there was evidence that the perpetrator may have entered through a window. Further, all three victims described their homes as having been ransacked and left in disarray. Notably, those three instances all involved a common feature of beer. In connection with the Rodriguez burglary, officers recovered a beer can with Gomez's DNA in Haffey's car, which the burglar had driven. In the Carranza burglary, the perpetrator took two beers from the refrigerator. Lastly, in the Garcia burglary, the burglar left behind an opened bottle of beer which he had taken from Garcia's refrigerator. This evidence was cross-admissible to show a common plan or scheme.

13

While evidence on some charges was cross-admissible as to other charges, there were not similarities connecting all of the crimes sufficient to make them all cross-admissible against each other. The People concede that "arguably the evidence of not every charge was cross-admissible to prove every other charge" and that the trial court did not engage in an analysis of whether each crime was cross-admissible against the others. (See *People v. Armstead*, *supra*, 102 Cal.App.4th at pp. 793-794.) The People argue, however, the error was harmless under *People v. Watson* (1956) 46 Cal.2d 818, 836. (*People v. Lindberg* (2008) 45 Cal.4th 1, 26 [errors in admission of evidence under section 1101, subdivision (b), are reviewed under the *Watson* standard of prejudice].) We agree the error was harmless because Gomez was not prejudiced. It was not reasonably probable he would have received a more favorable result absent the error.

Gomez argues he was prejudiced because the prosecutor argued there was overlap in the charges, pointed out the similarities in some of the charged crimes, such as the use of a screwdriver, evidence of beer, and entry through a window, and urged the jury to look at the evidence on all charges. Based on our review of the prosecutor's argument, the prosecutor never urged the jury to wholesale consider every charged crime to prove every other charged crime. The prosecutor properly argued there was overlap in the evidence because some crimes were connected. For example, the prosecutor argued evidence obtained from Haffey's car supported the car theft and the Rodriguez burglary because witnesses identified Gomez as the person driving the vehicle on the day it was stolen and using the vehicle in connection with the burglary. Similarly, the prosecutor argued evidence that Carranza's house was burglarized by someone who left behind

14

sneakers and a screwdriver with DNA matching Gomez's profile supported that Gomez was also the person who stole Carranza's two firearms.

Further, the trial court did not instruct the jury that it could consider the charged offenses jointly. Instead, the court instructed the jury with CALCRIM No. 3515, which provided: "Each of the counts charged in this case is a separate crime. You must consider each count separately and return a separate verdict for each one." (*People v. Manriquez* (2005) 37 Cal.4th 547, 579 [defendant's concern that the jury assumed it could consider the evidence of the charged offenses jointly and based its verdicts on criminal propensity was addressed by instruction similar to CALCRIM No. 3515].)

In any event, given the overwhelming evidence of Gomez's guilt on each count, it was not reasonably likely that Gomez would have obtained a more favorable result absent the prosecutor's argument. On the Quiroz car burglary, an officer inspected the vehicle shortly after Quiroz scared the perpetrator away. The officer found that someone had tampered with the driver's side door lock and there was blood on the car's door handle. The DNA obtained from the bloodstain matched Gomez's DNA profile. The probability that the DNA was from someone else was one in 1.2 sextillion.

In the Rodriguez burglary, Tate had a brief conversation with Gomez and got a good look at him in Rodriguez's well-lit bedroom. Tate also recognized Gomez when Gomez returned to the area for Haffey's car. Based on his interaction with Gomez, Tate was able to immediately identify Gomez in a photo lineup. Rodriguez saw Gomez come back to the area of his home for Haffey's car. Both Tate and Rodriguez identified Gomez at trial.

15

On the crime of unlawfully taking and driving Haffey's car, both Tate and Rodriguez saw Gomez drive the car. When officers ultimately recovered the vehicle, they found various items inside the vehicle, including sunglasses and a beer can, that had DNA matching Gomez's profile on them. The probability that the DNA was from someone else was one in 1.2 sextillion. Officers also recovered a loaded firearm magazine from Haffey's car. Although a criminalist was only able to recover a partial DNA profile from the magazine, he concluded Gomez was a possible source of the DNA. Further, the prosecution presented evidence that Gomez drove, possessed and controlled Haffey's vehicle and left items in it containing his DNA.

In the Lopez car theft, officers located Gomez near the stolen vehicle and obtained a DNA sample from him. Gomez's DNA matched DNA recovered from the steering wheel and gear shift in Lopez's vehicle. The probability that the DNA was from someone else was one in 8.8 quadrillion. Further, although at trial Monterossa denied that Gomez had driven the stolen vehicle, Monterossa initially told officers that Gomez had driven the car, parked at the curb and then asked Monterossa to drive to a nearby liquor store.

In the Garcia burglary, Gomez's DNA profile matched DNA recovered from the mouth of a beer bottle the perpetrator had left on Garcia's kitchen counter. The probability that a person selected at random would match the DNA on the bottle was one in 1.2 sextillion.

Lastly, in the Carranza burglary and firearm thefts, the perpetrator left behind a pair of Nike shoes and a screwdriver. Carranza's gun safe looked like it had been pried open with a screwdriver and a collectible pair of shoes was missing. Gomez was a

16

possible contributor to DNA recovered from the shoes and screwdriver the perpetrator left behind. The probability that a person selected at random would match the DNA was one in two million for the right shoe, one in 38 billion for the left shoe, and one in 1.12 sextillion for the screwdriver.

Given the state of the evidence, we are convinced that Gomez would not have obtained a more favorable result if the trial court would have ruled differently on the cross-admissibility of the evidence and the prosecutor had not argued the overlap of the evidence.

## II. *Accomplice Instructions*

Gomez argues the trial court erred by failing to sua sponte instruct the jury to determine if Monterossa was an accomplice whose statements to officers required corroboration and by failing to include Monterossa's statements as an exception to the rule that the testimony of one witness can prove an act. We reject these arguments. Gomez did not request these instructions.

"When the evidence at trial would warrant the jury in concluding that a witness was an accomplice of the defendant in the crime or crimes for which the defendant is on trial, the trial court must instruct the jury to determine if the witness was an accomplice" and that an accomplice's testimony must be corroborated. (*People v. Hayes* (1999) 21 Cal.4th 1211, 1270-1271; *People v. Tobias* (2001) 25 Cal.4th 327, 331.) "For instructional purposes, an accomplice is a person 'who is liable to prosecution for the identical offense charged against the defendant on trial in the cause in which the testimony of the accomplice is given.' [Citations.]" (*People v. Arias* (1996) 13 Cal.4th

17

92, 142-143.)  "In order to be chargeable with the identical offense, the witness must be considered a principal under [Penal Code] section 31."  (*People v. Fauber* (1992) 2 Cal.4th 792, 833.)

"An accomplice need not share in the actual perpetration of a crime to be chargeable as a principal therein; liability as an accomplice to a crime may be based on having aided and abetted its commission."  (*People v. Snyder* (2003) 112 Cal.App.4th 1200, 1220.)  "However, an aider and abettor is chargeable as a principal only to the extent he or she actually knows and *shares* the full extent of the perpetrator's specific criminal intent, and actively promotes, encourages, or assists the perpetrator with the intent and purpose of advancing the perpetrator's successful commission of the target offense."  (*Ibid.*)

The trial court has a sua sponte obligation " 'to instruct the jury on the principles governing the law of accomplices,' including the need for corroboration" when the evidence warrants it.  (*People v. Tobias*, supra, 25 Cal.4th at p. 331.)  However, "[t]he court need give such instructions only where there is substantial evidence that the witness was an accomplice."  (*People v. Boyer* (2006) 38 Cal.4th 412, 466.)  The evidence must be sufficient "to permit a jury to conclude by a preponderance of the evidence" that the witness was an accomplice.  (*People v. Hernandez* (2003) 30 Cal.4th 835, 874.)

Here, based on the evidence presented at Gomez's trial, the court had no sua sponte duty to provide an accomplice instruction regarding Monterossa.  At most, the evidence showed that (1) Monterossa followed Gomez while Gomez drove and parked Lopez's vehicle, and (2) after Gomez parked, Monterossa gave him a ride to a liquor store

18

and then to a house on Clay Avenue. There was no evidence that Monterossa helped to take or drive the vehicle and aided, promoted or encouraged the crime. "Mere presence at the scene of a crime which does not itself assist its commission or mere knowledge that a crime is being committed and the failure to prevent it does not amount to aiding and abetting." (*In re Michael T*. (1978) 84 Cal.App.3d 907, 911.) Further, "merely giv[ing] assistance with knowledge of the perpetrator's criminal purpose" is not sufficient for principal liability. (*People v. Sully* (1991) 53 Cal.3d 1195, 1227.) Based on the evidence, Monterossa was at best an accessory. "A mere accessory is not liable as an accomplice [citation], and a court is not obligated to given an accomplice instruction when the evidence establishes that the witness was merely an accessory." (*People v. Snyder*, *supra*, 112 Cal.App.4th at p. 1220.)

Gomez contends Monterossa must have been an accomplice because at the time of trial, he changed the story he had originally given to officers and denied any knowledge or involvement with the stolen vehicle. This evidence alone does not support accomplice liability on Monterossa's part. There was no evidence that Monterossa aided and abetted Gomez in taking or driving the vehicle or shared in Gomez's criminal intent. The evidence in this case simply did not permit a finding that Monterossa was an accomplice to Gomez's crime. Thus, the trial court had no sua sponte duty to instruct on accomplice principles.

### III. *Sufficiency of the Evidence*

Gomez argues insufficient evidence supported his convictions for attempted burglary of Quiroz's Jeep (count 1), being an ex-felon in possession of ammunition

(count 4), unlawfully taking and driving Lopez's Acura (count 5), burglary of Carranza's residence (count 7), and theft of two firearms (counts 8 and 9).

A.  General Legal Principles

" 'In reviewing a challenge to the sufficiency of the evidence . . . , we review the entire record in the light most favorable to the judgment to determine whether it discloses substantial evidence — that is, evidence that is reasonable, credible, and of solid value — from which a reasonable trier of fact could have found the defendant guilty beyond a reasonable doubt.' [Citation.]  'The appellate court presumes in support of the judgment the existence of every fact the trier could reasonably deduce from the evidence.' " (*People v. Ramirez* (2006) 39 Cal.4th 398, 464.)  Reversal is not warranted "unless it appears 'that upon no hypothesis whatever is there sufficient substantial evidence to support [the conviction].' "  (*People v. Bolin* (1998) 18 Cal.4th 297, 331.)  "[I]t is not within our province to reweigh the evidence or redetermine issues of credibility." (*People v. Martinez* (2003) 113 Cal.App.4th 400, 412.)  Likewise, reversal is not warranted merely because the circumstances might also be reasonably reconciled with a contrary finding.  (*People v. Thomas* (1992) 2 Cal.4th 489, 514.)  Our sole function is to determine if any rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt.  (*People v. Bolin*, *supra*, 18 Cal.4th at p. 331; *People v. Marshall* (1997) 15 Cal.4th 1, 34.)

B. Analysis

    1. Attempted Burglary of Quiroz's Jeep (count 1)

Gomez argues insufficient evidence supported his conviction for attempted burglary of Quiroz's vehicle because the meaning of the DNA evidence recovered from the vehicle was speculation. We disagree.

Here, Quiroz heard someone trying to break into his Jeep. Quiroz scared the person off and called the police. When an officer arrived, he found that someone had tampered with the driver's side door lock and there was blood on the door handle. Gomez's DNA matched the predominant DNA profile from the blood stain.

Gomez contends the DNA evidence was insufficient because a criminalist testified it was possible that if one person touches an object and then another person touches the same object, the first person's DNA could remain on the object and test as the predominant DNA profile. Gomez asserts this testimony supports an inference that he could have touched Quiroz's vehicle prior to the attempted burglary. It is, of course, settled that a conviction cannot be based on mere speculation and conjecture. (*People v. Marshall*, *supra*, 15 Cal.4th at p. 35 ["mere speculation cannot support a conviction"].) However, the jury could have reasonably concluded that Gomez's DNA was on Quiroz's vehicle because he tried to break into it. Unless it is clearly shown that "on no hypothesis whatever is there sufficient substantial evidence to support the verdict," we will not reverse. (*People v. Hicks* (1982) 128 Cal.App.3d 423, 429.)

21

2. Ex-Felon in Possession of Ammunition (count 4)

Gomez argues insufficient evidence supported his conviction of being an ex-felon in possession of ammunition because the only evidence connecting him to the ammunition found in Haffey's car was a partial DNA profile recovered from the magazine and the evidence showed other people had access to the vehicle between the time it was stolen and recovered.

Penal Code section 30305, subdivision (a)(1), makes it unlawful for a felon to own, possess, or have under his custody or control, any ammunition or reloaded ammunition. Here, Tate identified Gomez as having driven Haffey's Honda to burglarize Rodriguez's home in August 2012. When officers recovered the vehicle a week later, they found various items in it, including a bag of men's clothing, a beer can and a loaded magazine for a nine millimeter firearm. A pair of sunglasses from the bag of clothing and the beer can had DNA matching Gomez's profile on them. A criminalist was only able to recover a partial DNA profile from the firearm magazine, but concluded it was possible Gomez was a source of the DNA.

Based on the evidence, the jury could reasonably infer Gomez possessed and had custody and control over the ammunition found in the vehicle. Gomez drove the vehicle and officers found his personal belongings in the front and back seats. Gomez's DNA was recovered from some of those items. He was also a possible contributor to a partial DNA profile from the magazine. On the state of the evidence, a rational trier of fact could conclude Gomez possessed or had custody or control over the magazine. Contrary

22

to Gomez's argument, the jury's conclusion was not speculation or conjecture. Instead, it was a reasonable inference based on the evidence.

3. Unlawfully Taking and Driving Lopez's Vehicle (count 5)

Gomez argues insufficient evidence supported his conviction for unlawfully taking and driving Lopez's vehicle because no one saw him in it.

Officers observed a Lincoln vehicle closely following Lopez's vehicle. The cars pulled over at a curb together and then the Lincoln drove away. Shortly thereafter, officers contacted Monterossa, the driver of the Lincoln. Monterossa told officers that Gomez drove Lopez's car. Gomez's DNA was on the gear shift and steering wheel of Lopez's car. This evidence was sufficient to support the jury's verdict.

Gomez argues Monterossa's original statement to police was not credible and the DNA evidence only established Gomez had been inside the car, not that he drove it. Gomez's is essentially asking us to reweigh the evidence and make a credibility determination. That is not within our province on appeal. (*People v. Martinez*, *supra*, 113 Cal.App.4th at p. 412.) Accordingly, we reject Gomez's argument.

4. Burglary of Carranza's Residence (count 7) and Firearm Thefts (counts 8 and 9)

Gomez argues insufficient evidence supported his conviction for burglary of Carranza's residence and theft of two firearms from that residence because the only evidence that connected him to the crimes was DNA on the screwdriver and shoes left behind. Gomez contends the DNA evidence was insufficient because the screwdriver contained a mixture of DNA from three people and the shoes contained DNA from four

23

people.  Gomez again points to the criminalist's testimony regarding DNA left on an object after multiple people have touched it.

Gomez's argument calls for us to reweigh the evidence, which we will not do. Here, the evidence showed that the burglar entered Carranza's residence through a window and then ransacked the house.  The burglar took a pair of valuable shoes and used a screwdriver to pry open Carranza's gun safe and steal two guns from it.  The burglar left behind his own shoes and a screwdriver.  It is undisputed that DNA matching Gomez's DNA profile was on the screwdriver and shoes left in Carranza's residence. Although the items contained a mixture of DNA from multiple people, Gomez was the predominant contributor.  The probability that a person selected at random would be included as a possible major contributor was exceptionally small.  Based on this evidence, the jury could reasonably conclude that Gomez burglarized Carranza's residence and used a screwdriver to pry open a gun safe to steal Carranza's two firearms.

IV.  *Alleged Prosecutorial Misconduct*

Gomez argues the prosecutor committed multiple instances of prejudicial misconduct, depriving him of due process and a fair trial.  He asserts the prosecutor misstated facts, introduced facts outside the record, vouched for a witness, and appealed to the passions and prejudice of the jury.

Prosecutorial misconduct exists " 'under state law only if it involves " 'the use of deceptive or reprehensible methods to attempt to persuade either the court or the jury.' " ' "  (*People v. Earp* (1999) 20 Cal.4th 826, 858.)  In more extreme cases, a defendant's federal due process rights are violated when a prosecutor's improper remark " ' " 'infect[s]

24

the trial with unfairness,' " ' " making it fundamentally unfair. (*Ibid.*) However, " '[t]o preserve for appeal a claim of prosecutorial misconduct, the defense must make a timely objection at trial and request an admonition . . . .' " (*Ibid.*) As an exception to this rule, "[a] defendant will be excused from the necessity of either a timely objection and/or a request for admonition if either would be futile. [Citations.] In addition, failure to request the jury be admonished does not forfeit the issue for appeal if ' "an admonition would not have cured the harm caused by the misconduct." ' " (*People v. Hill* (1998) 17 Cal.4th 800, 820.)

Defense counsel did not object to the statements that Gomez now claims to constitute prosecutorial misconduct. Nothing in the record suggests that an objection would have been futile. Further, if defense counsel had objected and asked for an admonition, the jury could have been admonished to disregard the prosecutor's alleged misstatements or the court could have otherwise alleviated the alleged error. Accordingly, we conclude that because defense counsel did not object to the statements that Gomez now assigns as prosecutorial misconduct, the issue is not preserved for appeal.

Gomez attempts to avoid forfeiture by arguing defense counsel's failure to object to the alleged prosecutorial misconduct at trial constituted ineffective assistance warranting reversal. "Under both the Sixth Amendment to the United States Constitution and article I, section 15, of the California Constitution, a criminal defendant has the right to the assistance of counsel." (*People v. Ledesma* (1987) 43 Cal.3d 171, 215.) A defendant claiming ineffective assistance of counsel has the burden to show: (1)

counsel's performance was deficient, falling below an objective standard of reasonableness under prevailing professional norms; and (2) the deficient performance resulted in prejudice. (*Strickland v. Washington* (1984) 466 U.S. 668, 687; *Ledesma*, at pp. 216, 218.) We must decide if it is reasonably probable the result would have been different without defense counsel's allegedly deficient behavior. (*Strickland*, at p. 694.) However, we give substantial deference to counsel's tactical decisions during trial. (*People v. Frye* (1998) 18 Cal.4th 894, 979.) We may dispose of an ineffectiveness claim on the ground of lack of prejudice without determining whether his counsel's performance was deficient. (*Strickland,* at p. 697; *In re Fields* (1990) 51 Cal.3d 1063, 1079.)

Here, Gomez has not established prejudicial ineffective assistance because the prosecutor's comments did not amount to prejudicial misconduct. On Gomez's claim that the prosecutor misstated the facts, three of the four instances were error but not prejudicial. First, when listing items found in Haffey's recovered vehicle, the prosecutor misinformed the jury that officers recovered a firearm. There was no evidence of a firearm. Gomez contends the prosecutor's misstatement prejudiced him because it injected an implication that he was armed during the crime. We conclude there is no reasonable probability that the result of the proceedings would have been different had defense counsel objected. The jury heard evidence that officers recovered a loaded firearm magazine from the vehicle. The magazine evidence raised the same implication as evidence of a firearm. Further, whether Gomez was armed was not an element of the crimes of unlawfully taking and driving Haffey's vehicle and unlawful possession of

26

ammunition. On those crimes, the evidence overwhelmingly supported the jury's verdicts.

Second, the prosecutor misstated the facts when she told the jury that sunglasses *and* a bag of clothing in Haffey's vehicle had Gomez's DNA on them. In fact, only the sunglasses had Gomez's DNA. It is unlikely that this misstatement impacted the jury's verdict because the sunglasses were found *within* the bag of clothing. Although technically a misstatement, it was not such that it prejudiced Gomez. Even if defense counsel would have objected, the outcome of the proceeding would not have been different because the prosecutor's misstatement was minor.

Third, the prosecutor misstated that officers saw Gomez get out of Monterossa's Lincoln and proceed into a house. Gomez argues the misstatement resulted in prejudice because it corroborated Monterossa's original story to the police that Gomez was with Monterossa on the day of the crime, drove the stolen vehicle, and later got a ride to a house. The prosecutor's statement did not result in prejudice because Monterossa testified at trial that he was with Gomez, took him to a store, and then returned to the house where he had picked Gomez up. Further, DNA evidence from the steering wheel and gear shift of the stolen vehicle supported a conclusion that Gomez drove the vehicle. Based on the state of the evidence, defense counsel's failure to object to the prosecutor's statement did not result in prejudice such that it undermined confidence in the outcome.

As to Gomez's argument that the prosecutor misstated that the only DNA detected matched Gomez's DNA profile, we conclude he has misinterpreted the statement by taking it out of context. When the prosecutor stated that "you will see that every DNA

27

type they were able to detect matches the DNA on the defendant," she was contrasting the strong DNA samples collected from certain evidence against the partial DNA recovered from the firearm magazine. The prosecutor explained that it is harder to get DNA from items a person merely touches with their hands than from items with blood, sweat, tears, saliva and mucous membranes on them. She pointed out that the predominant DNA profile from the sunglasses in Haffey's car matched Gomez. However, the criminalist was only able to obtain a partial DNA profile from the firearm magazine, an item likely only touched by the perpetrator. We find no misconduct in the prosecutor's statement.

We also find no prejudice from defense counsel's failure to object to the prosecutor's statement that Monterossa changing his story was "textbook" recanting. Gomez contends the prosecutor introduced facts outside the record because there was no testimony about a "textbook." Based on our review of the prosecutor's comment, we conclude there is no reasonable probability that the jury construed the prosecutor's statement in the manner Gomez suggests. "[C]ounsel during summation may state matters not in evidence, but which are common knowledge or are illustrations drawn from common experience, history or literature.' [Citation.] 'A prosecutor may "vigorously argue his case and is not limited to 'Chesterfieldian politeness' " [citation], and he may "use appropriate epithets . . . ." ' " ' " (*People v. Stanley* (2006) 39 Cal.4th 913, 951-952.) In this case, the prosecutor merely used a colloquial expression.

Next, we conclude the prosecutor did not inappropriately vouch for Tate's credibility by stating in her rebuttal argument that he was "very careful," "very vigilant"

28

and "excellent." Although a prosecutor may not vouch for a witness's veracity, she "may assure the jury of a witness's apparent honesty or reliability based on matters in the record." (*People v. Woods* (2006) 146 Cal.App.4th 106, 113.) In this case, defense counsel had argued that Tate's identification of Gomez was unreliable because he only observed the perpetrator briefly from far away and in poorly lit conditions. Thus, in rebuttal, the prosecutor urged the jury to take into consideration that Tate testified in great detail as to what he saw and was careful and vigilant in his observations. The prosecutor's statement was not error because when evaluating a witness's testimony, the jury can consider the witness's behavior while testifying, how well the witness was able to remember things and how well the witness could see, hear or otherwise perceive the things about which he testified. (CALCRIM No. 226.)

Lastly, Gomez contends the prosecutor appealed to the passions and prejudice of the jury by remarking that Lopez and Garcia were hard-working, productive members of society who earned the property Gomez stole from them. We conclude that even if the prosecutor appealed to the passions and prejudice of the jury, the result of the proceeding would not have been different had defense counsel objected. Overwhelming evidence supported Gomez's convictions for unlawfully taking and driving Lopez's vehicle and burglarizing Garcia's home. On the vehicle theft, Monterossa told officers that Gomez had driven the stolen car, Gomez's DNA was on the steering wheel and gear shift, and Gomez was located nearby.

Likewise, in the Garcia burglary, the burglar left behind an opened bottle of beer, which had Gomez's DNA on it. The probability that the DNA was from someone else

was one in 1.2 sextillion.  Further, the beer was a common feature of Gomez's residential burglaries.  The residential burglaries also had other shared characteristics, including evidence that the perpetrator may have entered through a window and ransacked the homes.

Given the overwhelming evidence of Gomez's guilt, it was not reasonably probable the result would have been different had defense counsel objected when the prosecutor remarked about Gomez stealing from hard working people who earned their belongings.  Even looking at the alleged prosecutorial misconduct in totality, this is not a case where the prosecutor used deceptive or reprehensible methods to persuade the jury or where the prosecutor's remarks infected the trial with such unfairness that it made the trial fundamentally unfair.  (*People v. Earp*, *supra*, 20 Cal.4th at p. 858.)

## V.  *Prison Prior Warnings*

A.  Background

After the jury rendered its verdicts, defense counsel informed the court that Gomez was willing to admit five prison priors allegations.  The trial court advised Gomez that he had the right to a trial to determine the fact of the prior convictions, the right to remain silent, and the right to confront adverse witnesses.  Gomez stated that he understood those rights and waived them.  The court accepted Gomez's admissions and found the prison priors to be true.  Later, the court sentenced Gomez to one year for each prison prior, for a total of five years on the enhancements.

30

B.  Analysis

Gomez argues the trial court failed to warn him that a direct consequence of admitting his prior convictions would be to subject him to a longer prison term.  The Attorney General concedes that Gomez received an incomplete advisement of the consequences of his admission.  The parties disagree, however, as to the proper remedy.

Before accepting a defendant's admission to a prior prison term allegation, the trial court should "advise the defendant and obtain waivers of (1) the right to a trial to determine the fact of the prior conviction, (2) the right to remain silent, and (3) the right to confront adverse witnesses.  (*In re Yurko* (1974) 10 Cal.3d 857, 863.)"  (*People v. Mosby* (2004) 33 Cal.4th 353, 356.)  The trial court should also tell the defendant "the precise increase in the term or terms which might be imposed, if any, in the accused's case pursuant to . . . applicable statutes."  (*Yurko*, at p. 864.)  If an express waiver of the rights is not secured from the defendant, reversal is required unless the record as a whole shows the admission was voluntary and intelligent under the totality of circumstances.  (*Mosby*, at pp. 360-361.)  "The record must clearly reflect both the admonitions given the accused and the fact of the accused's waivers, if any."  (*Yurko*, at p. 865.)

When a defendant stipulates to a prior conviction without proper advisements, the stipulation must be set aside.  (*People v. Cross* (2015) 61 Cal.4th 164, 180.)  The remedy for the error is reversal as to the prior conviction enhancements and remand for a new trial on that issue only.  (*People v. Moore* (1992) 8 Cal.App.4th 411, 422.)  Because the trial court did not advise Gomez that a direct consequence of admitting his prison priors was to subject him to a longer prison term, his admissions must be set aside.

31

Accordingly, the trial court's true findings on these allegations and the imposed sentence enhancements under Penal Code section 667.5, subdivision (b), must be reversed and the matter remanded for a new adjudication of these allegations either by admission or trial, and for resentencing.

## DISPOSITION

The convictions are affirmed. The true findings on the prison prior allegations are reversed and the matter remanded to the trial court for a new adjudication of these allegations under Penal Code section 667.5, subdivision (b), either by admission or trial, and for resentencing thereafter.

NARES, Acting P. J.

WE CONCUR:

McDONALD, J.

PRAGER, J.*

---

*      Judge of the San Diego Superior Court, assigned by the Chief Justice pursuant to article VI, section 6 of the California Constitution.